# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TAMMY CONDON,

                              Plaintiff,

              v.                                    Case No. 18-CV-1458

ANDREW M. SAUL,

                              Defendant.

# DECISION AND ORDER

## PROCEDURAL HISTORY

Plaintiff Tammy Condon alleges she has been disabled since June 11, 2014, due to severe nerve damage; fibromyalgia; migraine headaches; a brain injury; and back, neck, and shoulder problems. (ECF No. 16-1 at 47; ECF No. 16-5 at 23.) In 2014 she applied for disability insurance benefits and supplemental security income. (ECF No. 16-1 at 12; ECF No. 16-4 at 1.) After her applications were denied initially (ECF No. 16-2 at 1-26, 151-52) and upon reconsideration (ECF No. 16-2 at 27-52, 153–54), a hearing was held before an administrative law judge (ALJ) on May 24, 2017 (ECF No. 16-1 at 51-96). On September 11, 2017, the ALJ issued a written decision, concluding that Condon was not disabled. (ECF No. 16-1 at 12–32.) The Appeals Council denied Condon's request for review on

July 24, 2018. (ECF No. 16-1 at 3-7.) This action followed. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 23, 24), and the matter is now ready for resolution.

## ALJ'S DECISION

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1571-1576, 416.971-976. The ALJ found that Condon "has not engaged in substantial gainful activity since June 11, 2014, the amended alleged onset date." (ECF No. 16-1 at 14.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). "In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an individual's ability to perform basic work activities." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). The ALJ concluded that Condon "has the following severe impairments: disorders of the cervical, thoracic and lumbar spine; obesity; knee disorders; right shoulder degenerative joint disease and a torn ligament; depression; posttraumatic stress disorder (PTSD); an anxiety disorder; and a learning disorder in reading." (ECF No. 16-1 at 14.)

At step three, the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926) (called "The Listings"). If the impairment or impairments meets or medically equals the criteria of a listing, and meets the twelve-month duration requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Condon "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (ECF No. 16-1 at 15.)

Between steps three and four, the ALJ must determine the claimant's residual functional capacity (RFC), "which is [the claimant's] 'ability to do physical and mental work activities on a regular basis despite limitations from her impairments.'" *Ghiselli v. Colvin*, 837 F.3d 771, 774 (7th Cir. 2016) (quoting *Moore*, 743 F.3d at 1121). In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-8p. In other words, the RFC determination is a function by function assessment of the claimant's "maximum work capability." *Elder v. Asture*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Condon has the RFC

> to perform sedentary work . . . except with additional limitations. She should never climb ladders, ropes, or scaffolds. She should not work at

unprotected heights or around dangerous moving machinery. She is occasionally able to climb stairs, balance, stoop, kneel, crouch, or crawl. She is occasionally able to reach overhead with the bilateral upper extremities. She is frequently able to handle and finger with the bilateral upper extremities. She is able to frequently but not constantly rotate the neck from side to side. She should avoid concentrated exposure to fumes, dusts, odors, gases, or other pulmonary irritants. She is able to understand, remember, and carry out simple instructions in an environment free of fast-paced production requirements and involving few, if any, work place changes.

(ECF No. 16-1 at 18.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1565, 416.965. The ALJ concluded that Condon "is unable to perform any past relevant work." (ECF No. 16-1 at 30.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant can do any other work, considering her age, education, work experience, and RFC. At this step, the ALJ concluded that, "[c]onsidering [Condon's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Condon] can perform." (ECF No. 16-1 at 31.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert (VE) who testified that a hypothetical individual of Condon's age, education, work experience, and RFC could perform the requirements of a call-out operator, a circuit board inspector, and a cashier. (ECF No. 16-1 at 31-32.)

After finding that Condon could perform work in the national economy, the ALJ concluded that Condon "has not been under a disability . . . from June 11, 2014, through the date of this decision." (ECF No. 16-1 at 32.)

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

It is not the Court's role to reweigh evidence or substitute its judgment for that of the ALJ. *Moore*, 743 F.3d at 1121. Rather, the court must determine whether the ALJ complied with her obligation to build an "accurate and logical bridge" between the evidence and her conclusion that is sufficient to enable a court to review the administrative findings. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas*, 745 F.3d at 806. If the ALJ committed a material error of law, the court cannot affirm the ALJ's decision regardless

of whether it is supported by substantial evidence. *Beardsley*, 758 F.3d at 837; *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

## ANALYSIS

Condon argues that the ALJ erred in (1) evaluating and assigning weight to the opinions of treating psychiatrist Dr. Todd J. Boffeli and treating pain management specialists Jeremy Scarlett, MD, and Christa Scheunemann, NP; (2) assessing her subjective-symptom allegations; and (3) not considering all of her impairments and the functional limitations they caused.

## I.     Treating source opinions

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). "An ALJ must offer

good reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted).

### A.    Dr. Boffeli

Dr. Boffeli began treating Condon's mental-health impairments in November 2014. (ECF No. 16-6 at 99-102.) After an initial visit, Dr. Boffeli referred Condon to Dr. Peter J. Kenny for psychotherapy. Thereafter, Dr. Boffeli saw Condon every three or four weeks to assess her mental status and manage her medications. (ECF No. 16-6 at 105-06; ECF No. 16-19 at 206-07; ECF 16-29 at 184-85; ECF No. 16-30 at 70-71; ECF No. 16-32 at 27-28; ECF No. 16-34 at 60-61; ECF No. 16-37 at 6-7; ECF No. 16-39 at 139-40; ECF No. 16-41 at 35-36; ECF No. 16-42 at 22-24; ECF No. 16-43 at 26-27; ECF No. 16-44 at 39-40; ECF No. 16-45 at 150; ECF No. 16-46 at 1-2, 111-12.) He diagnosed Condon with major depression (chronic, moderate to severe), a panic disorder with agoraphobia, a learning disorder in reading, and post-traumatic stress disorder traits. (ECF No. 16-44 at 40.)

On May 5, 2015, Dr. Boffeli completed a Mental Impairment Questionnaire. (ECF No. 16-21 at 168-73.) He indicated that Condon demonstrated an anxious affect, appeared depressed, and exhibited concentration problems during her mental status examinations. (*Id.* at 168.) He further indicated that Condon had a limited response to multiple medication trials and that she was likely to have ongoing symptoms. According to Dr. Boffeli, Condon's mental capacity to work was significantly limited. (*Id.* at 170-72.) He opined that Condon had marked limitations in activities of daily living, maintaining

social functioning, and maintaining concentration, persistence, or pace and that she had three episodes of decompensation within a twelve-month period, each lasting at least two weeks. (*Id.* at 173.) He also opined that Condon likely would be absent from work more than four days per month due to her impairments or treatment. The ALJ assigned little weight to Dr. Boffeli's opinions. (ECF No. 16-1 at 28.)

Condon argues that the ALJ failed to provide good reasons for rejecting Dr. Boffeli's opinions. (ECF No. 17 at 4-13.) She maintains that the ALJ "cherry-picked" the evidence to support her conclusion without considering the record as a whole, which Condon claims supports Dr. Boffeli's opinions. Condon contends that, if the ALJ had appropriately weighed Dr. Boffeli's opinions by assigning them controlling or significant weight, she would have been found disabled at either step three or step five of the sequential evaluation process.

The ALJ declined to give controlling weight to Dr. Boffeli's opinions, finding that they were inconsistent and "disproportionate to the objective findings in the treatment records," including Dr. Boffeli's own records. (ECF No. 16-1 at 28.) That finding is supported by substantial evidence. Dr. Boffeli's own treatment notes indicate that, despite her mental-health symptoms, Condon displayed reasonably good mental function during her mental status examinations. Those records repeatedly state that Condon was alert and oriented to person, place, and time and that she exhibited logical thought processes, no suicidal thoughts, no evidence of psychosis, no loose associations,

intact insight and judgment, a full range of affect, and an intact fund of knowledge. (ECF No. 16-6 at 106; ECF No. 16-19 at 207; ECF 16-29 at 185; ECF No. 16-30 at 71; ECF No. 16-32 at 27; ECF No. 16-34 at 61; ECF No. 16-37 at 6-7; ECF No. 16-39 at 140; ECF No. 16-41 at 36; ECF No. 16-42 at 23; ECF No. 16-43 at 26-27; ECF No. 16-44 at 39-40; ECF No. 16-46 at 1, 113.)

The ALJ did not, as Condon suggests, selectively discuss only the evidence that supported her conclusion. The ALJ noted Condon's claimed worsening symptoms (depression, anxiety, panic attacks, sleep disturbance, picking at her skin, difficulty concentrating, etc.) and several potential causes for them (a significant motor vehicle accident in 2013, a sexual assault in 2007, a history of encephalitis, and conflicts with her children, boyfriend, and ex-husband). (ECF No. 16-1 at 23.) The ALJ also mentioned several abnormal examinations, including Condon presenting with a flat affect and taking notes during Dr. Boffeli's November 2014 evaluation and Condon displaying an unkept appearance, poor hygiene, a dramatic and anxious affect, a slow rate of thoughts, and tangential thought content at times during a counseling session with Dawn Krueger, Licensed Clinical Social Worker, in November 2015. (*Id.* at 24 (citing ECF No. 16-6 at 100-01; ECF No. 16-33 at 2).)

Thus, the ALJ discussed evidence that both supported and detracted from her decision not to afford controlling weight to Dr. Boffeli's opinions. The ALJ was not "required to discuss every snippet of information from the medical records that might be

inconsistent with the rest of the objective medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013) (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009)). And this court may not reweigh the conflicting evidence in the record to reach a conclusion opposite that of the ALJ. *See Pepper*, 712 F.3d at 362 (citing *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)).

Condon argues that, in discussing treatment notes "describing positive days or hopeful remarks," the ALJ failed to appreciate the ups and downs of her mental illness. (ECF No. 17 at 11-12.) As support, she cites treatment notes from Dr. Boffeli indicating that Condon's depression symptoms were "at a moderate to severe level." (ECF No. 16-46 at 111.) That note reflects the severity of Condon's depression; it does not suggest that Condon's mental-health symptoms vacillated between extreme moods, and Condon has not cited any other evidence supporting her claim to experiencing good and bad days as a result of her mental illnesses. Consequently, her reliance on *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), wherein the Seventh Circuit criticized an ALJ for failing to understand the up and down nature of bipolar disorder, is misplaced.

Because Dr. Boffeli's opinions were inconsistent with substantial evidence in the record, the ALJ reasonably did not afford them controlling weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) ("[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.").

Nevertheless, a treating source medical opinion that is not entitled to controlling weight is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1517 and 416.927." SSR 96-2p. The ALJ correctly noted that Dr. Boffeli, a specialist in psychiatric disorders, had examined Condon every couple of weeks over a period of more than two years. (ECF No. 16-1 at 27.) Thus, the factors set forth in §§ 404.1527(c), 416.927(c) "required the administrative law judge to give great weight to [Dr. Boffeli's opinion] unless it was seriously flawed." *Bauer*, 532 F.3d at 608 (citations omitted). The ALJ identified one flaw—inconsistency with his own treatment notes—that is supported by substantial evidence. The other purported flaws, however, are not good reasons for assigning little weight to a treating source's opinion.

First, the ALJ concluded that "the marked and extreme limitations set forth by Dr. Boffeli [were] inconsistent with the treatment modalities implemented, as [Condon] was treated with fairly conservative measures and she did not undergo any inpatient psychiatric hospitalizations." (ECF No. 16-1 at 28.) Condon suffered from depression, PTSD, an anxiety disorder, and a learning disorder in reading. Her symptoms persisted despite multiple adjustments to her medications. (ECF No. 16-21 at 168). Condon also regularly attended psychotherapy. After Condon failed to make much progress after multiple sessions, her therapist referred her to a licensed clinical social worker, believing she could better meet Condon's needs. (ECF No. 16-31 at 123.) The ALJ failed to articulate why this treatment was considered "fairly conservative." *See Irving v. Berryhill*, Case No.

17-CV-1251, 2018 U.S. Dist. LEXIS 162512, at *10-11 (Sept. 24, 2018) (remanding where ALJ failed to explain why he characterized claimant's mental-health treatment, which consisted of "regular therapy sessions and medication," as "conservative").

Second, the ALJ determined that "Dr. Boffeli's opinion about absenteeism from work appear[ed] speculative." (ECF No. 16-1 at 28.) Dr. Boffeli was asked, on average, how often he anticipated that Condon's impairments or treatment would cause her to be absent from work. (ECF No. 16-21 at 173.) Of course his answer was speculative—Condon stopped working completely in June 2013 following a serious motor vehicle accident, so there's no record of absences from work after her amended alleged onset date. But that is not a good reason for rejecting his best estimate, which was necessarily informed by his extensive treatment relationship with Condon.

Because of these errors, the ALJ's decision to afford little weight to Dr. Boffeli's opinions is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight given to Dr. Boffeli's opinions in light of the record evidence and the §§ 404.1527(c), 916.927(c) factors.

B.     Dr. Scarlett and NP Scheunemann

Condon initially presented to Advance Pain Management in May 2015. (ECF No. 16-7 at 33-37.) She returned in April 2016 and was primarily seen by Christa Scheunemann, a nurse practitioner. (ECF No. 16-7 at 29-32.) Dr. Jeremy Scarlett assisted

in developing the plan of care, managed Condon's medications, and administered trigger point injections. (*Id.* at 24; ECF No. 16-20 at 14-16.)

On May 9, 2017, Dr. Scarlett and NP Scheunemann completed a questionnaire concerning Condon's physical capabilities. (ECF No. 16-26 at 158-59.) They opined that Condon could lift a maximum of five pounds occasionally. (*Id.* at 158.) They further opined that, in an eight-hour workday, Condon could perform sedentary work for one to three hours, stand/walk for less than one hour, and sit for one to three hours. According to Dr. Scarlett and NP Scheunemann, Condon could never use her hands repetitively, use her feet for repetitive operation of foot controls, bend, squat, climb, perform overhead work, or perform work at shoulder level. (*Id.* at 158-59.) The purported medical bases for these opinions were upper extremity weakness, status-post cervical fusion, status-post right shoulder surgery, and migraine headaches. (*Id.* 159.) The ALJ assigned little weight to the opinions of Dr. Scarlett and NP Scheunemann, finding that "many of their assessments [were] disproportionately extreme given the overall evidence." (ECF No. 16-1 at 27.)

Condon argues that the ALJ failed to provide good reasons for rejecting the opinions of Dr. Scarlett and NP Scheunemann. (ECF No. 17 at 13-17.) She maintains that the ALJ erroneously concluded that her limitations were only temporary in nature. She further maintains that the ALJ failed to explain how playing bingo demonstrated she could perform sedentary work, impermissibly "played doctor" in interpreting imaging

results, and ignored objective medical evidence that showed she continued to experience debilitating symptoms after her fusion surgery. Condon contends that, if accepted, Dr. Scarlett and NP Scheunemann's opinion regarding her inability to perform sedentary work "would have resulted in a finding of disability." (*Id.* at 13.)

Substantial evidence supports the ALJ's decision to reject Dr. Scarlett and NP Scheunemann's opinion that Condon could stand/walk for less than one hour in an eight-hour workday. Dr. Scarlett and NP Scheunemann explicitly noted that Condon was "current non-weight bearing due to leg fracture." (ECF No. 16-26 at 158.) Thus, the ALJ reasonably concluded that "the limitations attributed to lower extremity functioning were likely temporary in nature because the questionnaire was completed while [Condon] was healing from an ankle fracture, and do not reflect functioning over a 12-month period." (ECF No. 16-1 at 27.) The ALJ did not, as Condon suggests, find that any other limitations set forth in the questionnaire were temporary.

However, the ALJ's decision to reject Dr. Scarlett and NP Scheunemann's opinions on Condon's ability to perform sedentary work, sit, and use her upper extremities is not supported by substantial evidence. The ALJ gave two reasons for giving little weight Dr. Scarlett and NP Scheunemann's assessment of Condon's ability to sit and perform sedentary work: Condon "displayed adequate physical function during a number of examinations," and Condon "was able to engage in a reasonably good range of activities." (*Id.*) Neither qualifies as a "good reason."

In rejecting the opinions of Dr. Scarlett and NP Scheunemann, the ALJ did not cite any examples of Condon's purported adequate physical function. To the extent the ALJ was referring to her earlier discussion of the objective medical evidence (*see id.* at 19-22), she failed to build an accurate and logical bridge between that evidence and her specific finding. Also, despite acknowledging that the results of the physical exams were mixed—Condon "displayed adequate function at a number of . . . examinations" but "significant abnormalities" at others (*id.* at 20)—the ALJ's evaluation of Dr. Scarlett and NP Scheunemann's opinions discussed only the positive exams that supported her conclusion.

Similarly, the ALJ did not sufficiently explain how Condon's activities were inconsistent with Dr. Scarlett and NP Scheunemann's sitting limitations. The ALJ found that Condon drove "fairly long distances." (*Id.* at 27.) The treatment note cited in support of this finding states that Condon "recently drove to Greenbay [sic], Wisconsin and then Sturgeon Bay, Wisconsin." (ECF No. 16-29 at 157.) The note, which came from a therapy session with Condon's psychologist, does not indicate how far the drive was, how long Condon spent in each city, or if Condon stopped along the way. As such, it is not clear from the ALJ's decision how a one-time, in-state car trip demonstrates that Condon could sit and perform sedentary work for more than three hours in a typical workday.

The ALJ also found that Condon played "repeated games of bingo." (ECF No. 16-1 at 27.) But, again, the treatment note cited in support states that Condon played bingo

only "once or twice per month." (ECF No. 16-39 at 139.) The ALJ did not explain how playing an occasional game of bingo showed that Dr. Scarlett and NP Scheunemann's sitting limitations were too extreme. Overall, the ALJ failed to recognize that Condon had considerably more flexibility in engaging in activities like driving and playing bingo (including taking breaks and partaking only on days when her pain was manageable) than she would at a full-time, sit-down job. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (citations omitted) (noting that "[t]he failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases").

As for Dr. Scarlett and NP Scheunemann's assessment of Condon's upper extremity capabilities, the ALJ determined that "the limitations set forth in the questionnaire were disproportionate to the objective medical evidence." (ECF No. 16-1 at 27.) However, the ALJ discussed only evidence of Condon's right shoulder impairment. (*See id.* (citing ECF No. 16-6 at 253; ECF No. 16-23 at 35, 37).) She did not address how Condon's neck issues impacted her ability to lift and use her hands and arms. Condon repeatedly told her providers that her neck pain was her primary issue and that it caused numbness and weakness in her arms and fingers. (*See* ECF No. 16-6 at 118; ECF No. 16-7 at 19, 29, 114, 118; ECF No. 16-20 at 6, 10, 19; ECF No. 16-22 at 1; ECF No. 16-29 at 3.) And Dr. Scarlett and NP Scheunemann cited upper extremity weakness and status-post

cervical fusion as two bases for their assessment. (*See* ECF No. 16-26 at 159.) The ALJ erred in limiting her analysis to Condon's right shoulder issue.

Because of these errors, the ALJ's decision to afford little weight to Dr. Scarlett and NP Scheunemann's opinions concerning Condon's abilities to perform sedentary work, sit, and use her upper extremities is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight given to those opinions in light of the record evidence, including whether they may be entitled to controlling weight under §§ 404.1527(c)(2), 416.927(c)(2).

## II.     Condon's subjective symptoms

An ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p; *see also* 20 C.F.R. §§ 404.1529, 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly

articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p.

The ALJ accurately recited the two-step process. (ECF No. 16-1 at 18-19.) After describing the subjective allegations, the ALJ determined that Condon's "medically determinable impairments could reasonably be expected to produce [her] alleged symptoms." (*Id.* at 19.) However, the ALJ found that Condon's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.*)

Condon challenges the second step of the ALJ's subjective-symptom analysis, arguing that the ALJ failed to address several of the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). (ECF No. 17 at 21-25.) She maintains that the ALJ selectively described her activities of daily living, failed to consider how her pain worsened her depression and how not having contact with her children exasperated her symptoms, and did not sufficiently address her medications. The court largely agrees.

While the ALJ found that Condon's activities "suggested a physical and mental capacity in excess of what she alleged," (ECF No. 16-1 at 26), the examples she provided did not support that finding. Many of the activities the ALJ mentioned were not indicative of Condon's day-to-day capabilities. For example, the ALJ indicated that Condon played bingo once or twice per month, went out to lunch with her father once per month, drove to Green Bay and Sturgeon Bay in July 2015, and visited with others

and was walking more in August 2016. (ECF No. 16-1 at 26 (citing ECF No. 16-39 at 139; ECF No. 16-37 at 123; ECF No. 16-29 at 157; ECF No. 16-39 at 46).) These infrequent activities do not seriously undermine Condon's reported limitations, let alone demonstrate an ability to perform sustained work. The ALJ did not discuss Condon's function report, wherein she described a typical day: "After I wake up it takes a few minutes to gather my strength to get out of bed. I limit my standing, walking, sitting for no longer than 15 min[utes] or else I am in extreme pain. I mostly watch T.V. or listen to music." (*See* ECF No. 16-5 at 11.) Nor did the ALJ ask Condon at the administrative hearing to describe her typical day.

The ALJ also failed to address Condon's claimed limitations with respect to the other activities she discussed. The ALJ found it significant that Condon sometimes stayed with friends to get away from her abusive boyfriend (ECF No. 16-1 at 26 (citing ECF No. 16-39 at 46)), but she failed to mention that Condon told her therapist she had nowhere else to stay permanently (ECF No. 16-39 at 17). Similarly, the ALJ noted that Condon claimed to enjoy reading (ECF No. 16-1 at 26 (citing ECF No. 16-19 at 207)), ignoring that she also claimed to be able to read only for short intervals and to have difficulty retaining what she read (ECF No. 16-5 at 14; ECF No. 16-1 at 74). The ALJ therefore failed to provide support in the record for her conclusion that Condon's activities weighed against her account of disabling limitations.

The Commissioner argues that the objective medical evidence, Condon's course of treatment, the side effects from medication, and the opinion evidence all support the ALJ's evaluation of Condon's subjective symptoms. (ECF No. 21 at 17-18.) But each of these pieces of evidence has its deficiencies. As for the objective medical evidence, the ALJ acknowledged that medical testing revealed abnormalities in Condon's back, knees, and right shoulder and that Condon's physical examinations were a mixed bag of "significant abnormalities" and "adequate function." (ECF No. 16-1 at 20-23.) Likewise, Condon's psychologist and pain management providers indicated that she had failed conservative care (ECF No. 16-21 at 168; ECF No. 16-7 at 31), and the court has already remanded for a reevaluation of those opinions.

Moreover, the ALJ overstated the effectiveness of Condon's medication regimen following her fusion surgery. The ALJ cited a treatment note wherein NP Scheunemann wrote that Condon "continues to report that her pain medication regimen continues to reduce her pain to a level that allows her to remain functional." (ECF No. 16-22 at 4.) NP Scheunemann did not explain what she meant by functional. Based on her other treatment notes describing limitations in daily activities, it appears she simply meant that Condon, who was heavily medicated with narcotics at the time, was able to get through the challenges of daily living; she did not suggest that Condon could work full time.

The ALJ also indicated that Condon had "excellent relief with an epidural steroid injection." (ECF No. 16-1 at 21 (citing ECF No. 16-7 at 22.) However, that same treatment

note states that "the second injection was not as effective as the first," Condon continued to have "neck pain that radiates into the bilateral upper extremities," Condon failed conservative care, Condon was functionally impaired, and another steroid injection was warranted. (ECF No. 16-7 at 22.) At times, Condon reported that her medications were effective in improving her symptoms. (*See, e.g.*, ECF No. 16-7 at 19; ECF No. 16-20 at 10, 19.) Other times, she denied improvement (ECF No. 16-7 at 29; ECF No. 16-20 at 6), and her medications were adjusted accordingly.

Overall, the ALJ's evaluation of Condon's subjective symptoms lacks support in the record. The ALJ on remand shall reevaluate these allegations in accordance with §§ 404.1529(c), 416.929(c) and SSR 16-3p. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (remanding where ALJ failed to explain "the 'inconsistencies' between [the claimant's] activities of daily living . . . , his complaints of pain, and the medical evidence"). Though ALJs are not required to address every factor, on remand the ALJ should consider situations that aggravated Condon's symptoms and the interplay between Condon's pain and her mental-health symptoms. *See* §§ 404.1529(c)(3)(iii), 416.929(c)(3)(iii).

## III.     Condon's alleged impairments and limitations

Condon argues that the ALJ erred in assessing her RFC in several respects. Specifically, she maintains that the ALJ (1) erroneously determined that she could frequently handle and finger with her bilateral upper extremities; (2) failed to consider

functional limitations of her obesity; (3) failed to consider the effects of her migraine headaches; (4) failed to analyze all her impairments in combination; and (5) failed to accommodate her moderate limitation in concentration, persistence, and pace. (ECF No. 17 at 17-21, 25-26.) Given that the court has already determined remand is necessary, these issues will be discussed only briefly.

### A.  Handling and fingering

The ALJ determined that Condon had the RFC to "frequently . . . handle and finger with the bilateral upper extremities." (ECF No. 16-1 at 18.) In reaching that finding, the ALJ appears to have rejected the assessment of Dr. Scarlett and NP Scheunemann, who opined that Condon could not repetitively use her hands for simple grasping, pushing and pulling, or fine manipulation. (ECF No. 16-26 at 158.) The court explained in detail above why that finding was not supported by substantial evidence. Accordingly, on remand the ALJ shall reevaluate Condon's ability to handle and finger with her upper extremities in light of the weight assigned to the opinions of Dr. Scarlett and NP Scheunemann.

### B.  Obesity

Condon argues that "[t]he ALJ violated SSR 02-1p by failing to consider the functional limitations of [her] obesity." (ECF No. 17 at 19.) She maintains that the ALJ erred in finding that "[t]here was no evidence of a quantifiable impact of the obesity on [her] pulmonary, musculoskeletal, endocrine, or cardiac functioning" (*id.* (citing ECF No.

16-1 at 21)), as her primary care physician, Dr. Charles Sammis, assessed "less than sedentary work limitations" (ECF No. 17 at 19 (citing ECF No. 16-21 at 212-14). Also, Condon testified at the administrative hearing "that her weight bother[ed] her knees and interfere[d] with her ability to be active." (ECF No. 17 at 19-20 (citing ECF No. 16-1 at 85).)

The ALJ properly evaluated Condon's obesity under SSR 02-1p. The ALJ considered Condon's obesity at steps two and three of the sequential evaluation process, finding it to be a severe impairment that did not meet or equal a medical listing. (ECF No. 16-1 at 14-16.) The ALJ also considered Condon's obesity in fashioning her RFC (*id.* at 21), and explicitly noted that Condon was limited to sedentary work with additional postural limitations, in part because of her obesity (*id.* at 25). In declining to include additional restrictions relating to obesity, the ALJ rejected Dr. Sammis's opinion, finding it "disproportionate to the objective medical evidence." (*Id.* at 26-27.) Condon argues that "Dr. Sammis cited [her] weight as the 'objective' evidence" (ECF No. 22 at 10), but she otherwise does not take issue with the ALJ's reasons for assigning little weight to Dr. Sammis's opinion. The ALJ's reasons were supported by substantial evidence in the record. (*See* ECF No. 16-1 at 26-27 (citing the imaging results, notes from physical exams, the lack of support and explanation, and Dr. Sammis's potential bias).) Accordingly, the ALJ did not commit reversible error in evaluating Condon's obesity.

### C. Migraine headaches

The ALJ determined at step two that Condon's "occasional headaches" did not constitute a severe impairment. (ECF No. 16-1 at 15 (citing ECF No. 16-8 at 30).) Condon argues that her migraine headaches "are a significant impairment" and that the ALJ erred by failing to consider them. (ECF No. 17 at 20.)

Condon alleges that she was unable to work in part because of migraine headaches. (ECF No. 16-5 at 23.) The record contains multiple references to Condon complaining about headaches. (*See, e.g.*, ECF No. ECF No. 16-6 at 101, 118, 214; ECF No. 16-20 at 6; ECF No. 16-21 at 144.) And Dr. Scarlett and NP Scheunemann listed migraine headaches as one of the medical bases for their opinions. (ECF No. 16-26 at 159.) Given that the court has already directed the ALJ on remand to reconsider the weight attributable to Dr. Scarlett and NP Scheunemann's opinions, she should also take a second look at the extent to which the limitations set forth in those opinions are attributable to Condon's migraine headaches and what effect, if any, that has on her RFC assessment.

### D. Impairments in combination

Condon argues that the ALJ failed to consider all of her impairments in combination, as required by 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2), when she ignored her obesity, her migraines, and the interaction between her physical and mental impairments. (ECF No. 17 at 21.) However, she has not identified any additional

limitations stemming from her combined impairments. Condon, therefore, has not demonstrated that the ALJ committed a material error of law on this issue.

### E.     Concentration, persistence, or pace

Dr. Boffelli opined that Condon had marked limitations in maintaining concentration, persistence, or pace. (ECF No. 16-21 at 172.) The ALJ rejected that opinion, finding that Condon was only moderately limited in that functional area. (ECF No. 16-1 at 17, 27-28.) Given the moderate limitation, the ALJ determined that Condon had the mental RFC "to understand, remember, and carry out instructions in an environment free of fast-paced production requirements and involving few, if any, work place changes." (*Id.* at 18.) The VE testified that a hypothetical person with those limitations (and others) could work as a call-out operator, a circuit board inspector, and a cashier. (*Id.* at 93-94.) The ALJ relied on the VE's testimony in finding Condon not disabled at step five. (*Id.* at 31-32.)

Condon argues that the ALJ's RFC assessment and the hypothetical posed to the VE failed to account for her limitations in concentration, persistence, or pace. (ECF No. 17 at 25-26.) The ALJ shall reevaluate this limitation in light of the weight she attributes to Dr. Boffeli's opinion on remand. If another hearing is held, the ALJ shall ensure that the hypothetical question presented to the VE accounts for the particular limitations

stemming from Condon's mental-health impairments. *See Winsted v. Berryhill*, 923 F.3d 472, 476-77 (7th Cir. 2019) (collecting cases).

## IV.     Conclusion

For all the foregoing reasons, the court finds that the ALJ erred in (1) evaluating and assigning weight to Dr. Boffeli's opinions; (2) evaluating and assigning weight to Dr. Scarlett and NP Scheunemann's opinions on Condon's ability to perform sedentary work, sit, and use her upper extremities; and (3) evaluating Condon's subjective symptoms. Based on this record, however, the court cannot determine whether Condon was disabled as of June 11, 2014. Accordingly, the court concludes that it is necessary to remand this matter to the Commissioner for reconsideration of the ALJ's RFC assessment and, potentially, his step-five finding. On remand, the ALJ shall also reexamine Condon's ability to handle and finger with her upper extremities, her migraine headaches, and her limitations in concentration, persistence, or pace.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and this matter is **remanded** for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of December, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge